FABIOLA L. BELLEMARE v. MAURICE E. FORD.

SAME v. EARL A. ROBINSON.

*Murchie & Murchie* (*Mr. Alexander Murchie* orally), for the plaintiff.

*Robert W. Upton* and *Frederic K. Upton* (*Mr. F. K. Upton* orally), for the defendants.

PAGE, J. The accident happened in a public highway at the intersection of Central and Franklin Streets in Franklin on the afternoon of July 20, 1943. Central Street runs east and west, and Franklin Street intersects it from the south but does not cross it. Approximately in line with the sidewalks of Franklin Street, two crosswalks traverse Central Street to the northerly curb of the latter street. There were traffic lights at the intersection, but at the time of the accident they were not showing alternate green and red, and the amber light was blinking. A policeman stood at the westerly crosswalk about twelve feet from the northerly curb of Central Street, which is fifty-five feet wide from curb to curb. His position was just clear of the rear ends of two or three cars that were parked at angles of forty-five degrees against the northerly curb of Central Street, and between the two crosswalks.

There was a dispute in the testimony whether the policeman, at the time of the accident, was directing traffic and giving signals to drivers and pedestrians. However that may have been, Ford drove the Robinson truck westerly on Central Street and stopped within two or three feet of the easterly line of the easterly crosswalk, in order to permit some pedestrians to cross Central Street from the north to the south. When he stopped, the plaintiff, a woman in her late seventies, lame from a childhood attack of infantile paralysis, stood on the northerly curb preparatory to crossing. She appears to have followed the other pedestrians towards the south side of the street, using the easterly crosswalk.

After, as Ford supposed, the pedestrians had crossed, he started

the truck, heard the plaintiff scream, and stopped immediately. Upon the evidence, it could be found that between starting and stopping he had moved no more than twenty feet; and, if the plaintiff's witnesses were believed, his forward motion had been at most fifteen feet. From the point of collision, the forward movement was, at most, not more than ten or twelve feet, about half the length of the truck, or, if the plaintiff's witnesses be believed, only a matter of six or eight feet.

At no time until after the accident did Ford see the plaintiff. Though she was understandably confused when she said that she was hit when she had got to a point opposite the driver (the truck had a left-hand drive), it could be found from the testimony of an eyewitness and from the position of the plaintiff after the accident, that at the moment of impact she was in front of the right side, was thrown down by the forward motion, and the right front wheel passed over her leg, breaking it in two places. She was found lying with her head on the westerly marker of the easterly crosswalk, her body and legs extended southeasterly and only her legs under the truck. See *Isabelle* v. *Company*, 93 N. H. 189, 190.

Upon these facts the finding is not compelled, as argued by the counsel for the defendants, that the plaintiff walked into the side of the truck, though that point might be arguable to a jury. The defendants do not urge that there is no evidence that Ford's fault was at least a part of the cause of the accident, but they do take the position that it must be found that the plaintiff's negligence was a contributing cause.

Whether or not the plaintiff was careful when she left the curb and while she was proceeding in the wake of the other pedestrians depends upon what circumstances are found. She testified that she believed that Ford had stopped to permit pedestrians to cross. The jury may well have credited her testimony. They might also believe that even if she were mistaken in thinking she came as near to passing the front of the truck as she thought, she told the truth when she said that the truck did not start until she was in front of it. Her reliance on the situation as she saw it might be thought to be consistent with due care. There was no red light to indicate that the crossing was improper at the moment. What the amber blinker meant does not appear, but it could not be taken as a prohibition of crossing. It is not necessary to consider whether the policeman was directing traffic. Even if he was, his position close to the northerly curb, and the parked cars intervening between him and the plaintiff for the first dozen feet

of her progress in the street, could be found to cut off any view she might have had of his signals, if any. Indeed, the policeman testified that he never saw her. Findably, she was not negligent in failing to watch for a traffic officer not in the middle of the street, but far to one side. The motions for nonsuits and directed verdicts were properly denied.

The defendants excepted to the denial of a request for instructions relating to contributory negligence. It was given in substance and with such fulness as to present no question here.

The fifth request has been particularly urged upon us: "In determining whether or not the plaintiff was negligent, you should consider the fact that she had nothing to control, but her own locomotion." Reliance is placed upon *McCarthy* v. *Souther*, 83 N. H. 29, 34. Whatever the application of the requested instruction to one whose control of locomotion is normal, it cannot be applied in the same sense to an aged, lame woman who lacks such control. Her capacity to act was limited, and her failure to act to save herself could not be charged to her account as it might be in the case of an athletic man in his prime. The request was properly denied. The request did not seek an instruction that her care in crossing the street might be measured in the light of her lack of normal control.

The jury were told: "It was Mr. Ford's duty to operate his truck in such a way that the truck would not cause injury to the person of Miss Bellemare." The defendants excepted, on the ground that the jurors would understand that the defendants were insurers. Taken alone, the words quoted might so be understood. But thereafter the instructions went so explicitly into the rule of ordinary care that the jury must have apprehended the true rule. At the close of this long section of the instructions appear these words: "Was the conduct of Mr. Ford that of the ordinary man of average prudence [under the circumstances]? . . . If Mr. Ford's conduct measured up to that standard, then, of course, he was not negligent. If his conduct under the circumstances did not measure up to that standard, then he was negligent, and if his negligence caused or contributed to the cause of Miss Bellemare's injuries, he would be liable, assuming, of course, that she herself were not negligent."

The jurors were told that R. L., *c.* 119, *s.* 22 was applicable. The section reads: "Upon approaching a pedestrian who is upon a traveled part of a highway and not upon a sidewalk, such vehicle shall be slowed down and timely signal shall be given." The defendants excepted on the ground that in no event could the statute apply to

this case as far as the provision for speed was concerned. They also contended that signal, though required in some possible aspects of the case, would not be in others, and they excepted to the denial of a request that the jury be instructed that Ford was under no absolute duty to sound his horn before crossing the crosswalk, also that if the plaintiff was not in front of the truck when he started up, and Ford, in the exercise of ordinary care, would not have anticipated that she might cross in front of the truck, the statute as to signal did not apply.

The situation was susceptible of more than one interpretation. If the plaintiff was already in front of the truck when Ford started up, the situation seems more favorable for the defendants than they seem to have suggested. In that situation it would be plain that the causal negligence could consist only in Ford starting at all, if he ought to have seen that she was there. Not speed, but any motion at all, would be the cause of the accident, as far as Ford was concerned. He started in second gear. Before hitting Miss Bellemare, the truck traveled at most six or eight feet. If any motion at all was justified under the circumstances, the prompt stop indicates a reasonable speed. *Grealish* v. *Odell*, 89 N. H. 130, 131. "Speed, whether reasonable or not, is not causal of an accident unless it can be said that but for the speed as it was the accident would not have happened." *Maiwald* v. *Company*, 93 N. H. 276, 278. No lower rate of speed, obviously, would have enabled a lame woman to get out of the way. Nor would the sounding of the horn. On the assumption discussed, breach of the statute could not be found to be causal.

The same result would hold as to speed if, when the truck started, Miss Bellemare was not already in front of it, but was about to step in front of it. Distances were too short and time too momentary for reasonable belief that a lesser speed would have avoided the accident. Whether the sounding of the horn could have had any effect must depend upon whether it would have taken Miss Bellemare one step or several to have got in front of the truck or reached its side after she was discovered and warned by a driver of reasonable care so as to give her, in her aged and crippled condition, sufficient time to control her progress. As to the sounding of the horn, the defendants correctly saw that there might be a statutory duty on Ford's part, provided that Ford ought in the exercise of ordinary care to have foreseen that Miss Bellemare could be hit if he did not warn her to stop, and such warning would have been effectual. In such case, failure to sound the horn might be found to be a causal breach of the statute, but only in such case.

It may well be, as already indicated, that without reference to the statute the jurors could have found the defendants liable. But they may have found either (1) that the defendants were liable because Ford did not slow down, or (2) that they were liable because he did not blow his horn when she was in the street, whatever the factors in the situation.

*New trial.*

MARBLE, C. J., was absent: the others concurred.

Merrimack,
Feb. 21, 1946. } No. 3554.